UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                  :

ELIZABETH JOY BLAU,
                                  :

                Plaintiff,                        <u>OPINION & ORDER</u>
                                  :

             -against-                       18 Civ. 4881 (GWG)
                                  :

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,     :

               Defendant.               :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Elizabeth Joy Blau brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Acting Commissioner of Social Security (the "Commissioner") denying her claim for disability benefits under the Social Security Act (the "Act"). Both Blau and the Commissioner have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For the reasons stated below, Blau's motion is granted in part and denied in part.

I. <u>BACKGROUND</u>

    A. <u>Procedural History</u>

Blau filed an application for a period of disability and disability insurance benefits ("DIB") on June 4, 2015, alleging a disability onset date of September 1, 2009. <u>See</u> Certified Administrative Record, filed Sept. 18, 2018 (Docket # 12) ("R"), at 10, 104-06. On June 12,

---

[1] <u>See</u> Notice of Motion, filed Nov. 19, 2018 (Docket # 14); Plaintiff's Memorandum of Law, filed Nov. 19, 2018 (Docket # 15) ("Pl. Mem."); Notice of Cross-Motion, filed Feb. 6, 2019 (Docket # 18); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Feb. 6, 2019 (Docket # 19) ("Def. Mem."); Plaintiff's Reply to Defendant's Memorandum of Law in Support of the Commissioner's Decision, filed Feb. 12, 2019 (Docket # 20) ("Pl. Reply").

2015, Blau protectively filed for Supplemental Security Income ("SSI") benefits.  R. 191-96.

The Social Security Administration ("SSA") denied Blau's applications on August 25, 2015.

R. 107-11.  Blau requested a hearing before an administrative law judge ("ALJ") to review the

denial.  R. 115-19.  Blau was represented by Jack Vega, a lay representative, at a hearing before

an ALJ, R. 10, 152-53, which was held via videoconferece, see R. 36.  In a written decision

dated July 31, 2017, the ALJ found that Blau was not disabled within the meaning of the Act.

R. 10-22.  Blau requested that the Appeals Council review the ALJ's decision, see R. 186, and

on April 2, 2018, the Appeals Council denied Blau's request for review, R. 1-4.  This action

followed.  See Complaint, filed June 1, 2018 (Docket # 1).

B. The Hearing Before the ALJ

A hearing before the ALJ was held via videoconference on June 21, 2017.  R. 33, 35.

Blau testified from Goshen, New York, accompanied by a hearing reporter and her

representative, while the ALJ participated from White Plains, New York.  R. 35-36.  A

vocational expert ("VE"), Jeffrey Nocera, participated by telephone.  R. 36, 39.

Blau first testified about her work history.  In 2003 she earned $4445 working at a

laundromat her father owned in Orangeburg, New York.  R. 41-42.  Blau worked there for only a

few months, as her father had just purchased the laundromat and she was helping him get the

business started.  R. 42.  The ALJ noted that Blau's earnings records showed that she worked for

Ramapo Practice Management, LLC, in Ramsey, New Jersey.  R. 43.  Blau clarified that while

the corporate offices were located in New Jersey, she actually worked for Ramapo Radiology in

Pomona, New York.  R. 43.  She testified that she began her position right after she completed

ultrasound technician training.  R. 43.  Blau completed an 18-month ultrasound training program

at Good Samaritan Hospital, which included a six-month clinical component.  R. 45.  Blau

worked as an ultrasound technician for Ramapo Radiology in 2005, where she performed several types of ultrasounds.  R. 44.  Her work involved "manipulating patients" for seven to eight hours per day to perform the ultrasound examinations.  R. 44.  The VE identified this position in the Dictionary of Occupational Titles ("DOT") as an "ultrasound technician," which has a Specific Vocational Preparation ("SVP") rating of seven.  R. 45.[2]  However, Blau was let go from her ultrasound position at the end of November 2006, because she was "the last one hired, and the first one fired before they closed."  R. 43-44.  The ALJ then stated that the ultrasound technician position did not count as past relevant work, because Blau did not perform the job for long enough for it to meet the SVP requirements.  R. 46.  Blau also testified that she has a two-year college degree from a community college.  See R. 45.

The ALJ asked Blau about her work at DEC Copiers, Inc.  R. 46.  That company was owned by Blau's "father's best friend," and she worked as a representative for the company, answering phones, filling toner cartridges, taking orders, and performing other administrative tasks.  R. 46.  Blau confirmed that the position was a customer service representative position.  R. 47.  She worked at an office in Haverstraw, New York, where she sat at a counter with two other workers, each with their own computer and phone.  R. 48.  Her work consisted mostly of answering phone calls from customers requesting copy supplies, and then filling and sending out packages of the requested materials.  R. 48.  These packages could weigh anywhere from two to

---

[2]  The DOT has been replaced by an online database called the Occupational Information Network, or the O*NET.  See Dictionary of Occupational Titles Fourth Edition, Revised 1991, U.S. Dep't of Labor, http://www.oalj.dol.gov/libdot.htm.  The O*NET defines Special Vocational Preparation ("SVP") as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  O*NET OnLine Help - Specific Vocational Preparation (SVP), O*NET OnLine, https://www.onetonline.org/help/online/svp.  The SVP "levels" correspond to time periods.  Level 7 is "[o]ver 2 years up to and including 4 years."

25 pounds.  R. 48.  The ALJ identified this position as "customer service" or "administrative clerk," with an SVP of four.  R. 50.  The Dictionary of Occupational Titles ("DOT") listing for the job was 219.362-010, and it was a light-duty, semi-skilled position.  R. 51.  The ALJ confirmed that his testimony was consistent with the DOT.  R. 51.  The ALJ concluded that this position counted as past relevant work, as Blau worked at the position for a sufficient amount of time and made sufficient earnings to qualify as substantial gainful employment.  R. 51.

Blau next testified about the medical events that caused her to stop working in 2009.  She left her position at DEC Copiers, Inc., because she was hospitalized in connection with a back injury.  See R. 52-53.  She characterized this as a "catastrophic event" that caused her to be hospitalized for "a couple of weeks."  R. 53.  The ALJ then asked Blau about the origin of her back problems.  R. 53.  Blau explained that she has always had a "mild hunch," and that her posture "was not great."  R. 53.  About five years after she had her third child, who she testified "was in [her] arms for the first five years of her life," Blau felt a "nagging, aching" pain in her back.  R. 53-54.  Blau explained that she doesn't know "exactly what happened," but that one day when she bent down to pick up laundry, she felt "a pain that went from [her] buttocks all the way down to [her] toes."  R. 53.  She had "a dropped foot" with "severe neurological damage," and was taken in to Lennox Hill Hospital in Manhattan for emergency surgery that week "to minimize that neurological permanency."  R. 53-54.  Blau returned to ultrasound school one week after this surgery.  R. 54.  Blau confirmed that her next surgery was on August 8, 2012, which was a "lumbar laminectomy."  R. 54.  Blau characterized this surgery as "a disaster," and stated that she "came out of the surgery much, much worse with a lot of things that had been created by that surgery."  R. 55.  She later had a spinal cord stimulator inserted at the suggestion of her pain management doctor.  See R. 54-55.  She first had a "temporary" stimulator surgically

implanted, and then, after about a week, a permanent stimulator was implanted. R. 55. However, it turned out the temporary "trial" stimulator worked better for Blau than the permanent stimulator, which did not alleviate Blau's back or leg pain, and caused Blau to "tense up," causing spasms and "attack[s]." R. 55-56. After a year, Blau had the stimulator removed. R. 56.

Blau testified that she has also had numerous epidurals in her back, which are "the only thing that gets [her] out of a catastrophic event," where she "is on [her] hands and knees, can't move," and has to spend a few weeks in the hospital. R. 56.

Blau next testified about the extent of her pain. Because of her pain, Blau "cannot stand for more than a few seconds." R. 57. As she was sitting for the hearing, Blau testified that her "entire left leg is numb, and the pain is . . . at a level where [she] will have to get up in a few minutes just to alleviate it." R. 57. Blau takes "muscle relaxers, anti-anxieties, and at night . . . opiates," but doesn't "like to take the opiates during the day because of driving." R. 57. However, if she has to do so because of an episode, Blau takes a "30-milligram Oxycodone three to four hours [sic] a day." R. 57. Because she is allergic to the Oxycodone, Blau takes it with "50 milligrams of Hydroxyzine," or Benadryl. R. 57. This makes her "even more incapacitated," and "puts [her] to almost a comatose sleep." R. 57.

The ALJ next asked Blau to describe the "episodes" she referenced. R. 57. Blau explained that while she "live[s] with pain on a daily basis," when she has an "episode," then "all of a sudden [she] ha[s] a pain that completely locks [her]," such that she "can't move." R. 57. As of late, this has happened "at least four times a year," where she is "either hospitalized, or getting an epidural, at least." R. 57. She explained that "[t]here are some years where it's worse than others, but [she] ha[s] to be on medication all the time, otherwise [she] will

be in a chronic episode, or catastrophic point." R. 57-58. She has "been to four doctors," and each of them has stated that "[u]ntil there's a new technology," there is no surgery available that will help Blau manage her pain. R. 58. She uses the over-the-counter Aleve TENS-Unit, but it "do[esn]'t really do much for [her]." R. 58. A "patch of Lidocaine" does "help sometimes," and she wears one "almost every day." R. 58.

Blau also stated that for the past three years she has had a "a giant tumor on [her] spine." R. 58. She said that her doctors had told her that "it was a stable mass." R. 59. She had a biopsy of the tumor at Columbia Presbyterian three weeks prior to the hearing, which came back benign. R. 59. She was scheduled to have the tumor removed surgically on August 2, 2017. R. 59.

Blau next testified about various gastrointestinal issues. She has had her gallbladder removed, and has a very rare condition called "Sphincter of Oddi dysfunction." R. 59. She testified that the condition causes pancreatitis, which is very painful. R. 60. She testified that in the past two years she has experienced pancreatitis issues about "a dozen times." R. 60. When she has these symptoms, "they put [her] right into the hospital," because "[she] can't eat; [she] can't drink," and the doctors have to "give [her] GI system a complete break," and put her on "heavy, heavy IV pain medication" until "[her] numbers go down." R. 60. During these episodes, Blau's "liver function goes out of control." R. 60. During the previous year, from September through December, Blau believed that she "was in the hospital more than [she] was home," for "sometimes three, four weeks at a time." R. 61. Blau had a procedure to treat the condition, called an "ERCP,"[3] which "helped to the point where [Blau is] not running to the

---

[3] "ERCP" stands for Endoscopic Retrograde Cholangiopancreatography and, according to the National Institutes of Health, "is a procedure that combines upper gastrointestinal (GI) endoscopy and x-rays to treat problems of the bile and pancreatic ducts." See

hospital," but she still has "attacks" where she experiences vomiting and diarrhea "like just out of the blue, nowhere." R. 61. Blau also still gets "some back-up of the pancreatic juices," which "causes severe pain, abdominal pain beyond belief." R. 61. There is no medication that can relieve the condition; when Blau gets "an attack," she has to take opiates to manage the pain. R. 61. She also takes Zantac, "Priolosec for GERD, and for some of the reflux that [she] get[s] from the pancreatitis." R. 61. She also testified that because of her condition, fatty foods bother her and she avoids them. R. 61-62. In response to the ALJ's question of whether there had been any associated weight gain with the condition, Blau testified that she actually lost thirty pounds, which she was beginning to gain back. R. 62. She testified that she lost twenty pounds in two weeks while she was at Good Samaritan Hospital, and then, when she subsequently went to Columbia Presbyterian Hospital, they discovered a "bile leak," and "put a tube between [Blau's] ribs to drain the bile for six weeks." R. 62. Blau currently weighs about 175 pounds. R. 62-63.

The ALJ asked Blau to describe a "typical day." R. 64. Blau explained that she typically "get[s] up late because [she doesn't] sleep well at all at night." R. 64. She falls asleep "between 3:00 and 6:00 a.m." and gets up by "11:30 or 12 o'clock in the morning." R. 65. Blau explained that it "takes [her] a few minutes to get up out of bed" because "first thing in the morning [she is] stiff as a board." R. 65. She then "brush[es] her teeth, shower[s], wash[es] her face," and then eats a bowl of cereal for breakfast. R. 65. Blau explained that she "really can't do cooking per se," so she "order[s] in a lot," or her "parents come and bring [her] food," or they "go out for meals." R. 65. Blau "like[s] to read if [she] can concentrate long enough," or she will watch television in her recliner in her living room, using a cushion and "constantly moving positions"

https://www.niddk.nih.gov/health-information/diagnostic-tests/endoscopic-retrograde-cholangio pancreatography

to avoid discomfort.  R. 65.  Because her medications make her drowsy, by one or two o'clock in the afternoon Blau takes a nap for a few hours in her recliner.  R. 66.  In the afternoons and evenings she sees her parents or sister, and her father often takes her out to a diner for dinner.  R. 66.  Blau testified that she has "a girl that comes and does [her] laundry and cleaning" once per week, but will also come more often if Blau has "a bad episode."  R. 66.  In those cases, Blau's parents will also come help her.  R. 66.  Blau does most of her food shopping via Amazon Prime, even though she cannot use her food stamps on Amazon.  R. 66.  She testified that she ends up "spending [her] own money" because she cannot "carry the bags" she would need to carry if she went food shopping outside.  R. 66.  In the evenings, Blau takes her medication, and gets into bed "usually around 11 o'clock," where she "toss[es] and turn[s]," watches TV, and reads "when [she] can."  R. 66.  She takes "Hydroxyzine, Ativan, Zyrtec . . . a muscle relaxer and an Oxycodone" before bed, which make her "literally go into a semi-coma" before bed.  R. 66.  These medications "render [Blau] basically not able to function mentally," such that she "can't focus for long on any kind of — anything really."  R. 66-67.  Blau will leave her house "maybe two or three times a week," but otherwise she is "home all day long, all night long."  R. 67.  Blau also leases a car, which she drives three or four times per week.  R. 67.

The ALJ next asked Blau whether her medication caused any other side effects.  Blau has "chronic depression and anxiety," and believes that "some of that comes from the medication."  R. 67.  The medication also causes constipation and diarrhea.  R. 67.  Blau also mentioned "neck issues," which the ALJ asked her to expand upon.  R. 67-68.  Blau explained that while she "always kind of kept" her neck issues "on the back burner because of everything else going on," when she had an MRI, it showed that she had bulging disks on both sides and "some stenosis, and other stuff," which she then realized was causing weakness and pain in her arms.  R. 68.

8

Blau "bought a $200 pillow" to alleviate her neck pain, which "helps a little bit," such that "there are days where [she doesn't] even feel it," but there are also worse days. See R. 68.

Vega, Blau's representative, then questioned Blau. He first asked her about how long her back and pancreatic episodes result in her being incapacitated. R. 68. Blau responded that her pancreatic episodes can last "three works, or more." R. 69. Her back episodes can last from two to three weeks, until she "can get that epidural to snap [her] out of it," or, if she is hospitalized, until the doctor can do a procedure. R. 69. Blau also clarified that she naps from one to three hours daily. R. 69.

The ALJ subsequently asked the VE a series of questions. First, the ALJ confirmed with Blau that her date of birth was July 5, 1969, making her 47 years old on the day of the hearing. R. 70. The ALJ also confirmed that Blau has a high school diploma. R. 70. The ALJ then asked the VE to assume a hypothetical individual with the "same profile" as Blau. R. 70. The ALJ asked the VE to assume that the hypothetical individual could perform sedentary work but could not climb ladders, ropes, scaffolds, push, pull, bend, or crawl. R. 70-71. However, the hypothetical individual could occasionally climb ramps and stairs, balance, kneel, and crouch. R. 71. The ALJ asked the VE whether there were any jobs in the national economy that such an individual could perform. R. 71-72. The VE identified three representative positions: surveillance monitor (DOT 379.376-010), an unskilled, sedentary position with an SVP of 2, with approximately 122,500 jobs available; charge account clerk (DOT 205.376-014), an unskilled sedentary position with an SVP of 2, with approximately 46,100 jobs available, and; information clerk (DOT 237.367-018), a sedentary job with an SVP of two, with approximately 140,800 jobs available. R. 72-73.

C. The Medical Evidence

The Commissioner and Blau have both provided summaries of the medical evidence in the record. See Pl. Mem. at 2-9; Def. Mem. at 2-15. The summaries are substantially consistent with each other. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Sept. 21, 2018 (Docket # 13), ¶ 5, and neither party has done so. Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

D. The ALJ's Decision

The ALJ denied Blau's DIB applications in a written decision on July 31, 2017. R. 7. First, the ALJ found that Blau met the insured status requirements of the SSA through December 31, 2012. R. 12. Then, following the five-step test set forth in the SSA regulations, the ALJ found at step one that Blau had not engaged in "substantial gainful activity" since her alleged disability onset date of September 1, 2009. R. 12. At step two, the ALJ found that during the relevant period, Blau suffered from the following "severe impairments": "lumbar radiculopathy status post surgeries, cervicalgia, pancreatitis, gastroesophageal reflux (GERD), and irritable bower syndrome (IBS)." R. 13. The ALJ also found that Blau had the following non-severe impairments: left hip pain, hypothyroidism, mild peribronchial cuffing, neurogentic bladder, a small hietal hernia, a lipoma on the lumbar spine, and attention deficient disorder ("ADD"). R. 13.

At step three, the ALJ found that none of Blau's severe impairments, singly or in combination, met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. 15. In reaching this conclusion, the ALJ considered listing 1.04 (Disorders of the spine). R. 15. The ALJ found that Blau's impairments did not meet the

requirements of "subsection 1.04A since her September 2015 lumbar spine MRI showed only

mild bilateral foraminal stenosis, mild to moderate bilateral foraminal narrowing, and no disc

herniation." R. 15. The ALJ also noted that Blau "had a negative right-sided straight leg-raising

test performed at a pain management visit" in January 2015, where she "also showed normal

reflexes and sensation of her lumbar spine." R. 15. With respect to Blau's cervicalgia, the ALJ

noted that "the record does not contain imaging of the claimant's cervical spine," and that a June

2017 medical consultative examination "documented that she had a full range of motion of her

cervical spine and a full range of motion and full motor strength of her upper extremities."

R. 15. The ALJ also found that Blau did not met the requirements of subsection 1.04B, "since

she has no objective evidence of a diagnosis of spinal arachroniditis." R. 15. Lastly, the ALJ

found that Blau did not meet the requirements of subsection 1.04C, "since the evidence reflects

that the claimant can ambulate without the assistance of a device or devices that occupy both of

her upper extremities." R. 15.

Before moving to step four, the ALJ addressed Blau's residual functional capacity

("RFC"). R. 16-20. The ALJ found that Blau had the RFC to perform "sedentary work"[4] except

that Blau "cannot climb ladders, ropes, or scaffolds; and cannot push/pull, bend, or crawl," and

also can only "climb ramps and stairs, balance, kneel, and crouch on an occasional basis." R. 16.

In making the RFC determination, the ALJ reviewed the objective medical evidence and other

---

[4] Pursuant to 20 C.F.R. § 404.1567(a), "sedentary work"

involves lifting no more than 10 pounds at a time and occasionally lifting or
carrying articles like docket files, ledgers, and small tools. Although a sedentary
job is defined as one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties. Jobs are sedentary if
walking and standing are required occasionally and other sedentary criteria are
met.

evidence including Blau's testimony and symptoms under 20 C.F.R. § 404.1529, 416.929 and

SSR 96-4p. See R. 16-19. The ALJ also considered medical opinion evidence under 20 C.F.R.

§ 404.1527, 416.927, and SSRs 96-2p, 96-5p, 96-6p and 06-3p. R. 18-19.[5] In determining

Blau's RFC, the ALJ accorded varying weights to the opinions of the physicians and other

specialists who examined Blau and/or her medical records. R. 18-19. The ALJ gave "significant

weight" to the opinion of consultative examiner Dr. Julia Kaci, R. 18, who opined that Blau has

"moderate limitations to sitting, standing, and going up and down the stairs; mild limitations to

walking; and marked limitations to bending, pushing, pulling, lifting, and carrying," R. 485; see

R. 18. The ALJ also gave significant weight to the portion of Dr. Jay Dinovitser's opinion in

which he opined that Blau has mild limitations in sitting, moderate limitations in pushing,

pulling, walking, and climbing, and marked limitations in bending, lifting, carrying, and

standing. R. 18 (citing R. 596). However, the ALJ gave "little weight to the portions of Dr.

Dinovitser's medical source statement" regarding Blau's ability to stand and tolerate

environmental conditions, because the ALJ found that these opinions "were based upon the

claimant's subjective self-report of her left hip pain," which the ALJ found to be "a nonsevere

impairment." R. 19.

 At step four, the ALJ evaluated whether Blau could continue her past work as an

---

 [5] SSR 96-4p was rescinded on June 14, 2018. See Rescission of SSRs 96-3p and 96-4p,
83 Fed. Reg. 27816, 2018 WL 2967523. The regulation was rescinded because "the information
contained in SSR 96-4p duplicates policy in SSR 16-3p," which became effective March 28,
2016, see SSR 16-3p.

 SSRs 96-2p, 96-5p, and 06-3p were rescinded effective March 27, 2017. See Rescission
of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p, Fed. Reg. 15263, 2017 WL 3928298. These three
rules have been displaced by more recent final rules. See Revisions to Rules Regarding the
Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (January 18, 2017). However, because the
new final rules apply "in claims filed on or after March 27, 2017," the old rules apply in this
case. See Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p, 2017 WL 3928298, at *1-2.

administrative clerk, and concluded that based on Blau's RFC, she could not. R. 20. At step

five, the ALJ concluded — based on Blau's age, education, work experience, and RFC — that

there were jobs that exist in significant numbers in the national economy that Blau could perform

pursuant to 20 C.F.R. §§ 404.1569 and 404.1569(a). R.21.

The ALJ concluded that Blau "has not been under a disability, as defined in the Social

Security Act, from September 1, 2009, through the date of [the] decision." R. 22. Accordingly,

Blau was found to be "not disabled" under sections 216(I) and 223(d) of the Social Security Act.

R. 22.

## II. GOVERNING STANDARDS OF LAW

### A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d

370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson

v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938)); accord Greek, 802 F.3d at 374-75; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir.

2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126,

131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id.

§ 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his or her age, education, or work experience.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the

claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

We next discuss the two grounds Blau raises for reversing the ALJ's decision: (1) that the ALJ failed to properly assess whether Blau's impairments met or medically equaled a listing, Pl. Mem. at 1, 16-19; and; (2) that the ALJ's RFC determination was not supported by substantial evidence because "after affording significant weight to the vague opinions of Dr. Kaci and Dr. Dinovitser," the ALJ "disregarded those portions of Dr. Dinovitser's opinion that translated Plaintiff's impairments into actual functional limitations," id. at 1, 11-16; Pl. Reply at 1-3.

A.  The ALJ's Step Three Analysis

Blau argues that the ALJ erred at step three in determining that her impairments did not meet or equal listing 1.04(a) by pointing to only "two instances from the entirety of the record" suggesting that she does not meet the listing whereas the record in fact "includes evidence that would objectively mean that Plaintiff does in fact me[e]t the listing."  Pl. Mem. at 18.  In

particular, Blau points to an MRI from 2007 which "specifically stated that the disc was impinging the nerve root as required under listing 1.04(a)." Id. (citing R. 305). Blau also points to an MRI from June 2012 which "showed worsening of stenosis and exuberant scarring from her post laminectomy syndrome causing the impingement on the existing L5 and S1 nerve root on the left side." Id. (citing R. 520). In addition, Blau points out that consultative examinations showed that Blau "had a positive straight leg raise test in both the seated and supine positions, limited range of motion, decreased sensation, and no reflexes in her right ankle." Id. (citing R. 595). According to Blau, the cited examination demonstrated that she "suffered from every requirement listing in Listing 1.04(a)." Id. Blau notes that other entries in the record confirm the findings of this examination, noting that Blau showed a positive straight leg raise test on several occasions. Id. (citing R. 321, 343, 346, 403, 484, 584, 587). In addition, Blau notes that she was "consistently found to have weakness in her left lower extremity and decreased sensation," id. (citing R. 311, 403, 464, 484, 499, 500), and that "others noted that [Blau] had decreased or no reflex in her left ankle," id. (citing R. 467, 484, 595).

As stated above, at step three in the sequential analysis, the ALJ determines if the claimant suffers from a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Blau bears the burden of showing that she meets a Listing. See Poupore, 566 F.3d at 306. To meet this burden, Blau must "meet all of the specified medical criteria [in the listing]. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (footnote, citations, and emphasis omitted); see also 20 C.F.R. §§ 404.1525(c)(3), 404.1529(d)(2)-(3); accord Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order); Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs., 360 F. App'x 240, 243 (2d Cir. 2010) (summary order); Wood v.

Colvin, 987 F. Supp. 2d 180, 192 (N.D.N.Y. 2013). To show that he or she meets the criteria, a claimant "must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques." Knight v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012) (citing 20 C.F.R. § 416.926(b)).

For a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), to meet Listing 1.04(a), it must result in compromise of a nerve root (including the cauda equina) or the spinal cord with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1.

Per SSA policy, "for a disorder of the spine to meet listing 1.04(a) at step three in the sequential evaluation process, the claimant must establish the simultaneous presence of all the medical criteria in paragraph A." Social Security Acquiescence Ruling (AR) 15-1(4), Radford v. Colvin: Standard for Meeting the Listing for Disorders of the Spine With Evidence of Nerve Root Compression, 80 FR 57418-02, Sept. 23, 2015, 2015 WL 5564523 (emphasis added). Additionally, "[o]nce this level of severity is established, the claimant must also show that this level of severity continued, or is expected to continue, for a continuous period of at least 12 months." Id. (emphasis added).

Here, Blau has failed to show that any paragraph A criteria she exhibited continued or were expected to continue for at least 12 months. The June 13, 2017, consultative examination with Dr. Dinovitser showed that Blau had reduced range of motion in her lumbrosacral spine, R.

595 ("Lumbar spine shows flexion 45 degrees, extension 10 degrees, side bending full, rotation full on right, 15 degrees on left."), positive straight leg raising tests in both the sitting and supine positions, and absent reflex in the left ankle and decreased strength in the left lower extremity, R. 595, though the examination notes also indicate that no muscle atrophy in the extremities was evident, R. 596. Other records that Blau cites show her exhibiting some, but not all, of the required criteria at different points. For example, a letter dated July 26, 2012, from Dr. Jeffrey S. Oppenheim to Dr. Deepak Vasishta indicates that on that day, Blau "demonstrate[d] positive straight leg raise signs bilaterally," and some diminished sensation in the S1 dermatome of her left leg, but also that she had "symmetric and brisk" reflexes in "both knees and ankles," and "5/5" strength in "dorsiflexion, plantar flexion, knee flexion, and extension." R. 321. Notes from a January 12, 2015, visit with Dr. Dilip Subhedar document a positive straight leg raise only on the left side (at 45 degrees), "full and asymptomatic" flexion of the lumbar spine to 75 degrees, "full and asymptomatic" extension of the lumbar spine to 25 degrees, normal muscle strength, reflexes, sensation, and an active range of motion of the lumbar spine. R. 343. A February 2015 follow-up visit showed similar examination findings, except that Blau's lumbar spine extension was restricted to 10 degrees. R. 345. Other notes in the record that Blau cites similarly fail to document the simultaneous presence of the symptoms required by the 1.04(a) criteria. See R. 311 (letter from Sean E. McCance dated August 31, 2007, documenting Blau's complaint of "mild weakness in the left lower extremity" but also noting "[l]umbar active range of motion within normal limits all planes and pain free," and a normal "[b]ilateral lower extremity motor and neurologic exam"); R. 403 (office note from Sean E. McCance dated September 22, 2009, showing negative straight leg raise on the right, normal lumbar range of motion, and normal bilateral lower extremity motor and neurologic exam except mild decreased

sensation along the S1 dermatome); R. 464-67 (records from Good Samaritan Hospital from April and May 2015 noting absence of left lower extremity reflexes but not documenting other symptoms required by 1.04(a)); R. 484 (notes from August 12, 2015, consultative examination with Dr. Julia Kaci, showing positive straight leg raises in the prone position, but negative straight leg raises on the right in the sitting position); R. 499-500 (notes from a June 19, 2012, visit with Dr. Vasishta documenting weakness in Blau's lower left extremity, inability to bear weight on the left side of the body, but no documentation of other symptoms required by 1.04(a) criteria); R 583-84 (March 14, 2016, visit notes from All Med & Rehabilitation documenting positive straight leg raising but providing no information about other criteria symptoms). In other words, there is simply not evidence to show that all the criteria were met simultaneously for the requisite time period.

Blau argues that the ALJ erred because she "only considered one MRI and one pain management visit in determining that Plaintiff did not meet the qualifications of listing 1.04(a)," and "[i]t is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports her determination, without affording consideration to evidence supporting the plaintiff's claims." Pl. Mem. at 17 (citing Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004)). While it would have been better if the ALJ had specifically marshaled the evidence we have just discussed, remand for this purpose is not required. The Second Circuit has stated that although it has

> cautioned that an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence."

Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry v.

Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)); accord Solis, 692 F. App'x at 48; De La Paz on behalf of S.S.D. v. Comm'r of Soc. Sec., 2018 WL 4179455, at *11 (S.D.N.Y. Aug. 31, 2018); Hairston ex rel. S.N. v. Comm'r of Soc. Sec., 52 F. Supp. 3d 657, 672-73 (S.D.N.Y. 2014); Batista ex rel. M.B. v. Astrue, 2010 WL 3924684, at *7 (E.D.N.Y. Sept. 29, 2010). This is not a case where we must remand on the ground that the ALJ's decision leaves the court "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." Berry, 675 F.2d at 469. Rather, the evidence in the record, discussed above, makes plain that there was not the simultaneous persistence of all the criteria required by 1.04(a) for at least 12 months. Accordingly, we conclude that the ALJ did not err by finding that Blau's spinal impairments did not meet or medically equal listing 1.04.

B. The ALJ's RFC Determination

Blau argues that the ALJ's RFC determination is not supported by substantial evidence because she afforded significant weight to the "vague" portions of the opinions of Dr. Kaci and Dr. Dinovitser, while "disregard[ing] those portions of Dr. Dinovitser's opinion that translated Plaintiff's impairments into actual functional limitations." Pl. Mem. at 1, 11-16; Pl. Reply at 1-3. Blau also argues that if the ALJ considered and accepted Dr. Dinovitser's opinion that Blau could only sit for 30 minutes at a time, and could only stand for 10 minutes at a time, R. 599, it would mean that there was insufficient evidence to support the finding that there were jobs in the national economy that Blau could perform because there was no evidence that any jobs that the ALJ assumed were available to Blau had a sit/stand option, see Pl. Mem. at 14.

No treating source opined that Blau had any limitations. Rather, Drs. Kaci and Dinovitser are the only doctors who opined as to any such limitations. Dr. Kaci opined that "the

claimant has moderate limitations to sitting, standing, and going up and down the stairs; mild limitations to walking; and marked limitations to bending, pushing, pulling, lifting, and carrying." R. 485. The ALJ gave "significant weight" to these opinions. R. 18. The ALJ also gave "significant weight" to the portions of Dr. Dinovitser's opinion in which he opined that Blau had "mild limitations in sitting, moderate limitations in walking, pushing, pulling, and climbing, and marked limitations in standing, bending, lifting, and carrying." R. 18 (citing R. 596). However, the ALJ stated she was giving "little weight" to the portion of Dr. Dinovitser's "medical source statement of ability to do physical work-related activities regarding the claimant's ability to stand and tolerate environmental conditions, as they were based upon the claimant's self-report of her left hip pain," which the ALJ concluded was a non-severe impairment. R. 19.

The ALJ's reason for discounting that portion of Dr. Dinovitser's opinion is unclear. The ALJ states that she gave little weight to the portion of the opinion "regarding the claimant's ability to stand and tolerate environmental conditions," because these opinions "were based upon the claimant's subjective self-report of her left hip pain," which the ALJ earlier had found to be a non-severe impairment. R. 19. The problem with the ALJ's statement is that only the portion of Dr. Dinovitser's opinion addressing environmental limitations references Blau's left hip pain. R. 602. Blau's ability to stand is addressed in a separate portion of Dr. Dinovitser's opinion report that discusses Blau's ability to sit, stand, and walk. See R. 599. In this section, Dr. Dinovitser does not reference Blau's self-reported hip pain in explaining how he arrives at his conclusion with respect to her sitting, standing, and walking limitations. Rather, he states his conclusions are "[b]ased on exam." See R. 599. Nonetheless, we find this discrepancy not to be significant because the ALJ's decision stated she was accepting Dr. Dinovitser's findings

regarding Blau's ability to "stand" and the decision is otherwise clear that the ALJ accepted Dr. Dinovitser's findings on this question. R. 18. Thus, we find that the ALJ intended to reference only the section on environmental limitations when discussing the portion of the opinion she gave "little weight."

The weight given to the opinion of Dr. Kaci, however, raises a serious concern. As Blau correctly points out, Pl. Mem. at 12-13, the Second Circuit has held that when compiling an RFC from the record, an ALJ may not rely on opinions that employ the terms "moderate" and "mild" absent additional information. Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) (such terms are "so vague as to render [them] useless"); accord Selian, 708 F.3d at 421 (concluding that an ALJ, in determining claimant's RFC, could not rely on the "remarkably vague" opinion of a consulting physician that the claimant "should be able to lift . . . objects of a mild degree of weight on an intermittent basis") (citing, inter alia, Curry, 209 F.3d at 123-24); Garretto v. Colvin, 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day."); Young v. Comm'r of Soc. Sec., 2014 WL 3107960, at *9 (N.D.N.Y. July 8, 2014) (conclusion by single consulting physician that claimant had undefined "moderate" limitations in sitting not substantial evidence for finding that claimant could perform sedentary work); Richardson v. Astrue, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (consulting doctor's vague conclusion that "[plaintiff's] ability to sit was 'mildly to moderately' impaired . . . provides no support for ALJ's [ ] conclusion that [plaintiff] could perform sedentary work"); see also Burgess, 537 F.3d at 128-29 (noting that the opinion of a medical expert is not "sufficiently substantial to undermine the opinion of the treating physician," when such an opinion vaguely describes an impairment with

words such as "mild" or "moderate") (citing Curry, 209 F.3d at 123). A possible exception to this rule exists, however; terms such as "mild" and "moderate" can constitute substantial evidence where "the facts underlying that opinion and the other medical opinions in the record lend [the terms] a more concrete meaning." Davis v. Massanari, 2001 WL 1524495, at *8 (S.D.N.Y. Nov. 29, 2001); see also Richardson v. Colvin, 2016 WL 3179902, at *7 (W.D.N.Y. June 8, 2016) (collecting cases).

We conclude that this case law does not apply to the ALJ's consideration of Dr. Dinovitser's opinion as to sitting/standing because Dr. Dinovitser gave specific responses on these topics. See R. 599. Dr. Dinovitser specifically found that Blau had the ability to sit for 30 minutes continuously, with an ability to sit for seven hours in total out of an eight hour workday. R. 599. He also concluded that Blau could stand for 10 minutes continuously up to an hour a day. R. 599. This conclusion is supported by Dr. Dinovitser's examination of Blau. See R. 592-603; see also Ashby v. Astrue, 2012 WL 2477595, at *12 (S.D.N.Y. Mar. 27, 2012) (finding that ALJ did not err by relying on opinion evidence contained in consultative examiner's report where report used the terms "moderate" and "mild" where the report also "evidence[d] a thorough physical examination of Plaintiff and include[d] a highly specific report of the examination"). In light of these very specific findings, the use of terms such as "mild" and "marked" by Dr. Dinovitser to describe Blau's ability to sit and stand, R. 599, are not vague.

There remain two problems, however. First, the ALJ did not rely simply on Dr. Dinovitser's opinion to determine Blau's limitations. She also gave "significant weight" to the opinion of Dr. Kaci, who did not fill out a medical source statement of ability to do work-related activities, and opined without elaboration that Blau had "moderate" limitations with respect to sitting, standing, and going up and down stairs, as well as "mild" limitations with respect to

walking.  See R. 485.  As Curry and the other cases we have just cited make clear, an assertion

that there are "moderate" limitations as to sitting and standing is vague and thus provides little

additional support for the ALJ's findings as to Blau's RFC.  Because it is not clear that Dr.

Kaci's examination, see R. 483-84, found Blau's impairments to be less severe than Dr.

Dinovitser's examination, see R. 592-603, we cannot conclude that the ALJ could properly use

Dr. Kaci's assessment of Blau to support the ALJ's RFC determination.  Accordingly, remand is

required to allow the ALJ to assess the limitations in light of the need to discount the use of

terms such as "moderate" and "mild."

Blau also argues that even if the ALJ could properly accept Dr. Dinovitser's opinion that

Blau could only sit for 30 minutes continuously and stand for 10 minutes continuously, this

conclusion would not allow for a finding that Blau could perform sedentary work.  Pl. Mem. at

14.  Blau's argument is that the need to move from sitting to standing would erode the otherwise

available job base for sedentary positions.  We question whether this is the case.  See Halloran v.

Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("The regulations do not mandate the presumption that

all sedentary jobs in the United States require the worker to sit without moving for six hours,

trapped like a seat-belted passenger in the center seat on a transcontintental flight.").  But since

the case must be remanded to clarify Blau's limitations, we direct the ALJ to clarify with a VE

whether these limitations (or any other relevant limitations that may be found following remand)

would affect the occupational base available to Blau.

V.  CONCLUSION

For the foregoing reasons, Blau's motion for judgment on the pleadings (Docket # 14) is

granted in part and denied in part, and the Commissioner's motion for judgment on the pleadings

(Docket # 18) is granted in part and denied in part.  The case is remanded for further proceedings

consistent with this Opinion and Order.  The Clerk is requested to enter judgment.

SO ORDERED.

Dated: New York, New York
   September 16, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge
